**UNITED STATES of America**

v.

**Henry J. CIOVACCO, Jr.,
and John A. Stanton.**

**Crim. No. 73–179–F.**

United States District Court,
D. Massachusetts.

Nov. 12, 1974.

Asst. U. S. Atty. Lawrence Cohen, Boston, Mass., for plaintiff.

Francis Bellotti, Quincy, Mass., for defendant Ciovacco.

Mitchell Benjoya, Zisson & Benjoya, Boston, Mass., for defendant Stanton.

## OPINION

FREEDMAN, District Judge.

. Defendants in this four-count indictment have moved to suppress evidence seized in the search of defendant Ciovacco's aircraft. This motion was heard by a magistrate on May 6, 1974, but in accordance with the requirements of Wingo v. Wedding, 418 U.S. 461, 94 S. Ct. 2842, 41 L.Ed.2d 879 (1974), the matter was re-heard by this Court on

September 19, 1974. The parties have stipulated that evidence taken before the magistrate on certain issues is to be evidence before this Court; evidence on other matters was heard de novo. The Court hereinafter enters its findings and conclusions:

On June 4, 1973, Thomas Bailey, then a special agent for U. S. Customs, received information from a reliable informant that a Cessna airplane N310D had refueled at Port Lavaca airport in Texas. During this 4:00 a. m. refueling operation the pilot had left one of the two engines running and had then paid for the fuel in cash. This information was given to Bailey since the Customs Service regards paying cash for fuel and leaving an engine running as suspicious, especially in view of the proximity of the airport to Mexico.[1] The information was relayed to Robert J. Bishop, supervising agent of the Drug Enforcement Administration ("DEA") [2] in Boston, who was at the time employed by the Boston office of the Customs Service.

The same plane was again in Texas on July 24, 1973. This time it was observed by an F.A.A. watch supervisor at Corpus Christi. The pilot had departed at 10:10 p. m. after informing the tower that he was heading north. After a few miles on a northerly course, the plane turned south and continued in that direction until radar contact was lost—approximately fifty miles south.

On July 25, 1973, at 4:00 a. m., the informant at Port Lavaca again saw the Cessna aircraft. As before, the pilot left one engine running and paid cash for his fuel. This information was relayed to Bishop around 9:30 that morning. At 11:00 a. m. Bishop conducted a briefing for several agents of the Bureau of Narcotics and Dangerous Drugs (B.N.D.D.). Following the briefing, Agents John Kelley and Odell Handcox were dispatched to Norwood Airport in Massachusetts. They remained at Norwood from 2:30 p. m. until 3:15 p. m. when they were ordered to Marshfield Airport, arriving there at 4:00 p. m.

At 4:45 p. m. Cessna N310D touched down at Norwood and then took off again; it landed at Marshfield at 5:00 p. m. Defendant Ciovacco climbed out of the aircraft and secured it to the ground—a procedure which required five to ten minutes. A short time after the plane had landed, Officer Charles Teague of the Marshfield Police arrived to assist Kelley and Handcox. None of these men were in uniform. At 5:15 p. m. defendant Stanton arrived in his Cadillac automobile and drove to the vicinity of the aircraft. He and Ciovacco engaged in conversation for approximately ten minutes. Stanton left the vehicle and went to the administration building about seventy-five yards away. Ciovacco drove the automobile to the far side of the plane, backed up to the aircraft, and opened the trunk of the Cadillac.

Kelley walked briskly out to the plane, confronted Ciovacco, and identified himself as an agent of the B.N.D.D. He requested permission to inspect the cargo; Ciovacco consented. Handcox and Teague had arrived at the scene at approximately the same time from a different direction.

There was conflicting testimony as to whether the agents' guns were drawn. The Court finds that no weapons were visible to the defendant at this juncture. Teague admitted that his pistol was drawn but that it was a small caliber weapon concealed in his hand. Ciovacco testified that he relinquished the keys and the agents opened the baggage compartment. I find that Ciovacco opened the baggage door after the request to inspect was made by Kelley. I further find that Ciovacco was not aware of his right to refuse to submit to the search.

1. Port Lavaca is approximately 200 miles north of the border with Mexico.

2. The Drug Enforcement Administration came into being after the events in this case took place.

When the compartment was opened, contraband was found and Ciovacco was placed under arrest. Stanton then returned from the administration building and was arrested.

▆ The Government challenges defendant Stanton's standing to bring a motion to suppress. This contention is without merit; Stanton qualifies as an "aggrieved person" under Federal Rule of Criminal Procedure 41(e). *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

No warrant had issued for the search of Cessna N310D. The burden is upon the Government to demonstrate that the search in question falls within one of the exceptions to the warrant requirement of the Fourth Amendment. *United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951). The Government offers alternative justifications for the warrantless search: (1) valid consent by defendant Ciovacco; or (2) probable cause with exigent circumstances. The Court will first examine the consent theory since, if the Government prevails on this argument, probable cause need not be demonstrated.

▆ The Supreme Court has recently re-examined the doctrine of consent searches in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). That case, in reversing the Ninth Circuit, held that a defendant need not know that he has a right to refuse consent in order to voluntarily consent. The test for voluntariness is one of ". . . totality of all the circumstances." Defendant's lack of knowledge of the right to refuse to permit the search is but one of the facts which must be weighed. *Id* at 227, 93 S.Ct. 2041.

There is no easy index of what qualifies as "voluntary." As Mr. Justice Stewart stated, writing for the majority in *Schneckloth*:

The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official

coercion cannot be resolved by any infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches would jeopardize their basic validity. Just as true with confessions, the requirement of a "voluntary" consent reflects a fair accommodation of the constitutional requirements involved. In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches. In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of "voluntariness." 412 U.S. at 229, 93 S.Ct. at 2048.

There are few facts in this case which serve to enlighten the Court one way or the other on the question of voluntariness. There was little conversation. Agent Kelley testified that he introduced himself, showed his identification, and asked to inspect the cargo; Ciovacco answered, "O.K." Ciovacco's testimony indicates that no question was asked; that he was told the aircraft would be searched. Another fact is that no guns were visible—at least until after the search and arrest. Finally, there is the fact that Ciovacco was not aware of his right to refuse to submit to the search.

▆ The burden is on the Government to prove voluntariness. *Bumpers v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The Court has chosen to believe the testimony of Agent Kelley and Officer Teague over that of defendant Ciovacco. But while this evidence establishes consent, it does little to indicate voluntariness. I have carefully reviewed the cases decided since *Schneckloth*. Those finding voluntary consent usually point

to some exculpatory strategy of the defendant in consenting, *see*, e. g., United States v. Leland, 376 F.Supp. 1193 (D. Del., 1974); United States v. DeMarsh, 360 F.Supp. 132 (E.D.Wis., 1973), or at least to an amiability between the police and the defendant, United States v. DeMarco, 488 F.2d 828 (2d Cir., 1973). Nothing of this kind appears in this case. The Government asserts that the consent was forthcoming because the defendant was resigned to the fact that he had been caught in the act. No demeanor evidence, or statements have been introduced to support this contention.

■ The Government argues that if Kelley's identifying himself as an agent is enough to nullify voluntariness, then the *only* valid consent searches will be those in which the defendant has expressly waived his right to refuse to submit to a search. The Court disagrees. Consent may be demonstrated without such a waiver as in the examples cited above. The Government has the burden of providing adequate factual material in the "totality of all the circumstances" to convince a court of voluntariness. After a careful analysis of the facts in this case, the Court concludes that the Government has not met its burden.

■ The second theory upon which the Government bases its contention that the search is valid is that of probable cause with exigent circumstances. This exception, as with all the exceptions to the warrant requirement of the Fourth Amendment, depends upon reasonableness of the search. Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). For the Government to prevail on the exigent circumstances theory it must establish (1) probable cause for the search, and (2) reasonable belief that there is a danger that the contraband will be removed or destroyed. United States v. Rubin, 474 F.2d 262 (3rd Cir., 1973). There is a line of cases beginning with Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and recently

re-affirmed in Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), which holds that the fact that a vehicle is the object of search satisfies the exigent circumstances requirement, since the inherent mobility of vehicles creates what amounts to a *per se* exigency. This doctrine is not absolute, and, if this mobility is in some way impeded, this exception may not apply. *See*, e. g., Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

■■ The Government asks that the Court apply this "automobile" exception to the facts of the instant case. No case has been cited by counsel, nor has the Court found one, which applies the *Carroll* doctrine to airplanes. The reasoning of the cases which employ this exception, however, appears to support an extension to planes since they fit the general requirement of vehicles capable of removal. The Court finds it unnecessary to reach the question of whether this aircraft, in its secured condition, fulfills the exigency requirement since it does not appear that the requisite probable cause to conduct the search was present.

Brinegar v. United States, 338 U.S. 160, 164, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), in an exhaustive factual analysis to determine whether there was probable cause for a warrantless search, cites with approval the formulation of Carroll v. United States, *supra:*

. . . the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a *belief, reasonably arising out of circumstances known to the seizing officer,* that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid. [Emphasis added.] *Id.* 267 U.S. at 149, 45 S.Ct. at 283.

The First Circuit discussed the quantum of evidence necessary to establish probable cause and held that it requires

more than "mere suspicion," but less ". . . than would justify conviction." *Rosencranz v. United States*, 356 F.2d 310, 314 (1st Cir., 1966). *Rosencranz* was a case in which there had been a search warrant issued. The Court indicated that the standard for probable cause was higher in the case of a warrantless search than in a case in which a search warrant had been issued.

The facts upon which the Government bases its assertion of probable cause to search appear to be:

1. Ciovacco's plane had been at Port Lavaca, Texas, on June 4, 1973. While refueling at 4:00 a. m., one engine was left running and the fuel had been paid for in cash. This activity was considered suspicious by the authorities due to the proximity of Port Lavaca to Mexico. The information had been relayed to Boston since the plane was registered to a Massachusetts resident.

2. On July 24, 1973, the same plane was observed at Corpus Christi. The pilot indicated that he was headed north, but turned south, and continued south for approximately fifty miles before radar contact was lost.

3. On July 25, 1973, at 4:00 a. m., the aircraft was again spotted at Port Lavaca; one engine was left running; and the fuel was paid for in cash.

4. The plane was due in the Boston area at 4:00 p. m., July 24, 1973. It touched down at Norwood at 4:45 p. m., and finally landed at Marshfield at 5:00 p. m.

5. An automobile was backed up to the plane after it landed.

There is no question but that the conduct of defendant Ciovacco was of a suspicious nature. It was certainly enough to prompt further investigation. But the Court concludes that the information possessed by Agent Kelley at the time of the search falls short of probable cause and thus the warrantless search was "unreasonable" within the meaning of the Fourth Amendment.

In accordance with the foregoing, the Court orders that the motion to suppress be allowed.