**UNITED STATES of America,
Appellant,**

v.

**Mitchell ROTHBERG et al., Appellees.**

**No. 603, Docket 71–2175.**

United States Court of Appeals,
Second Circuit.

Argued March 21, 1972.

Decided May 17, 1972.

Guy L. Heinemann, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. N. Y., David G. Trager, Asst. U. S. Atty., on the brief), for appellant.

Alan Scribner, New York City (Michael Metzger, San Francisco, Cal., Ivan S. Fisher, New York City, on the brief), for appellees.

Before HAYS, MANSFIELD and MULLIGAN, Circuit Judges.

HAYS, Circuit Judge:

The Government appeals, pursuant to 18 U.S.C. § 3731 (1970), from an order of the United States District Court for the Eastern District of New York, granting defendants' motion to suppress evidence.

We accept the District Court's findings of facts. On the morning of February 2, 1971, detectives of the New York Joint Task Force on Narcotics received a tip "that defendant Mitchell Rothberg would receive a large shipment of hashish that day and sell or distribute it immediately to customers, one of whom would be defendant Gary Brittman." Surveillance of the defendants' activities throughout the day culminated in the arrest of Brittman and one Steven Rosenthal, whose case was severed, while they were driving away from Rothberg's parents' home in separate cars; several suitcases full of hashish were seized from their cars. At about 8 P.M., Rothberg and defendant Wilson were arrested at Rothberg's parents' home in Queens. At the Rothberg house the detectives also seized a suitcase of hashish in the kitchen, and more hashish, opium, and certain papers in the basement. Except for what was found in the basement, the district court denied the motion to suppress the drugs and the statements later taken from the defendants.

Since the evidence seized in the basement was in "plain view" of anyone there, the issue on this appeal is whether the detectives had any legal justification for going to the basement, Coolidge v. New Hampshire, 403 U.S. 443, 465–466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), especially in light of the strictures on searches incident to arrest, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

The testimony at the hearing conflicted. A Detective Holden testified that as the officers and the defendants were preparing to leave the house, or between 15 and 45 minutes after entering, "Mr. Rothberg and Mr. Wilson requested they

get their jackets because it was cold outside . . . . [In response to a question from the officer] [t]hey said the jackets were in the basement." A Special Agent Byrne testified that shortly after entering the house, he asked Wilson for his jacket and for the keys to a Ford Transit that he had been driving, and that Wilson responded that his jacket was in the basement. A Detective Ryan thought, though he was unsure, that the defendants' request for their coats precipitated the trip to the basement. A Detective Canavan, placing the time either shortly before departure or shortly after arrival, said that Special Agent Byrne asked Wilson for his identification and the keys to the Transit, and Wilson replied, "They are in my jacket downstairs." Canavan also said that he himself asked Wilson where his jacket was, and that after falsely stating that it was in a bedroom, Wilson said that it was in the basement. The defendants denied saying anything that would have indicated that jackets, identification, or keys were in the basement. Wilson claimed that while he was still pretending that his jacket was in the bedroom, officers appeared with his wallet, which had been downstairs. Rothberg denied asking for his jacket, or stating that it was downstairs.

The trial court's analysis of this evidence was as follows:

"Before the officers went into the basement, they had arrested the defendants and taken them into custody. From the testimony of Canavan and Byrne, those two, together with Wilson, were the first to arrive in the basement. The only excuse for the descent into the basement by these officers was to find the keys to the Ford Transit and the identification papers of Wilson. It was not at the request of either Wilson or Rothberg that the officers proceeded to the lower level. They therefore had no consent or legal basis to do so. Holden testified that he went downstairs because both defendants requested their jackets. But this, as far as Wilson is concerned, is in direct conflict with the testimony of Canavan, Byrne, and Wilson himself. Moreover, while Holden was seen in the basement, the other officers do not remember seeing Rothberg in the basement at the same time. The court believes that while Officer Holden was a reliable and honest witness, he was mistaken as to the time and circumstances under which the defendants requested their jackets. The burden of establishing the legality of the basement search was upon the Government, and in view of the significantly conflicting police testimony, the court finds that the Government has failed to meet that burden."

Contrary to the district judge, we think that the testimony credited by him leads to the conclusion that the defendants consented to the search of the basement. The judge did not believe the defendants' denials; rather he ruled solely on the basis of the "conflicting *police* testimony" (emphasis added). We do not find these conflicts as "significant" as did the district judge. The police testimony establishes that the officers went to the basement in response to indications by the defendants that their jackets, identification, and keys would be found there. The conflict between Holden's testimony, which related the defendants' request for their jackets, and that of the rest of the officers, which revealed Wilson's responses when asked for his keys and identification, can be explained in part by the fact that Holden did indeed arrive in the basement separately from the other officers, and under different circumstances. In other words, his version of the events is not clearly inconsistent with that of the other witnesses. The police testimony reveals a situation similar to that in United States v. Gaines, 441 F.2d 1122 (2d Cir.), vacated and remanded on other grounds, 404 U.S. 878, 92 S.Ct. 223, 30 L.Ed.2d 159 (1971). There is no evidence here of coercion or other circumstances that would render the consent invalid. United States v. Gorman, 355 F.2d 151 (2d Cir. 1965), cert. denied,

384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966); United States v. Como, 340 F.2d 891 (2d Cir. 1965); United States v. Smith, 308 F.2d 657 (2d Cir. 1962), cert. denied, 372 U.S. 906, 83 S. Ct. 717, 9 L.Ed.2d 716 (1963); United States v. Dornblut, 261 F.2d 949 (2d Cir. 1958), cert. denied, 360 U.S. 912, 79 S.Ct. 1298, 3 L.Ed.2d 1262 (1959). As this court said in United States ex rel. Lundergan v. McMann, 417 F.2d 519 (2d Cir. 1969), "the mere fact that a suspect is under arrest does not negate the possibility of a voluntary consent. Neither does the suspect's knowledge that the search will almost certainly demonstrate his guilt." Id. at 521. Since the only issue is the voluntariness of the consent, the parties' arguments as to the propriety of the officers' request for keys, identification, or jackets, seem to us irrelevant.

The order of the district court granting appellees' motion to suppress is reversed.

MULLIGAN, Circuit Judge (concurring):

I concur in the opinion of Judge Hays who determined that there was a consent to the search of the basement. However, I believe that there is an additional justification for the seizure of the material in the basement irrespective of consent. As this court has held in United States v. Titus, 445 F.2d 577 (2d Cir.), cert. denied, 404 U.S. 957, 92 S.Ct. 323, 30 L.Ed.2d 274 (1971) officers may seize anything in plain view "while they were where they had a right to be." United States v. Titus, *supra*, 445 F.2d at 579. In my view, the officers were rightfully in the basement. They had observed the Ford Transit which was driven by Wilson pull up to the Rothberg residence; packages were seen being removed from the vehicle to the house; they observed Wilson drive the van away and park it in a parking lot where it could have been stolen, its contents pilfered or where a confederate of Wilson might have driven it off. Before

entering the Rothberg residence the police further knew that two other vehicles which had been observed there that day, had been seized and searched and both were found to have contained hashish. The trial court credited the testimony of Officer Canavan and Defendant Wilson that the agents asked for the keys to the Ford Transit; that Wilson first told them that the keys were in his jacket in the bedroom and then admitted that the jacket was in the basement. Hence the agents had a legitimate, reasonable ground for going into the basement. They were not conducting a general or exploratory search, they were not rummaging; they had an extraneous valid reason for being present and when they got into the basement the contraband material was in plain view. In view of all of the circumstances the interest of the police in the keys to the Ford Transit was valid; they were where they had a right to be.

MANSFIELD, Circuit Judge (dissenting):

I dissent for the reason that in my view the majority substitutes its findings of fact for those of the district court, even though the latter are supported by substantial evidence, are not clearly erroneous, and are based upon the trial judge's personal observation of the witnesses and his appraisal of their credibility. Even if, on the cold transcript of 1,809 pages, we might have found differently, I believe that we are precluded from doing so by Rule 52(a), F.R.Civ.P.

All parties agree that the validity of the warrantless search and seizure of drugs and papers in the basement of Rothberg's home depends on whether the Joint Task Force officers were properly in that portion of the premises when they saw those items. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). It is equally clear that they had no power lawfully to enter the basement except at the request, or with the consent, of Rothberg

or Wilson.[1] When the Government seeks, as it did here, to justify a warrantless search on the basis of the defendant's consent, it must bear the burden of proving a consent "freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); United States v. Fernandez, 456 F.2d 638, 640 (2d Cir. Feb. 24, 1972). Such consent, as we have often noted, should not be lightly inferred. See United States v. Du-Shane, 435 F.2d 187, 192 (2d Cir. 1970); United States ex rel. Lundergan v. McMann, 417 F.2d 519, 521 (2d Cir. 1969). Moreover, and most importantly for our purposes, "whether or not such consent has been given is primarily a question of fact, better left to the trial judge, who must pass upon the credibility of the witnesses." United States v. Callahan, 439 F.2d 852, 861 (2d Cir.), cert. denied, 404 U.S. 826, 92 S.Ct. 56, 30 L.Ed.2d 54 (1971). See also United States v. Gaines, 441 F.2d 1122, 1123 (2d Cir.), vacated and remanded on other grounds, 404 U.S. 878, 92 S.Ct. 223, 30 L.Ed.2d 159 (1971); United States v. Jordan, 399 F.2d 610, 614–615 (2d Cir.), cert. denied, 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968); United States v. Bracer, 342 F.2d 522, 524 (2d Cir.), cert. denied, 382 U.S. 954, 86 S.Ct. 427, 15 L.Ed.2d 359 (1965).

The district court's decision was based upon findings made by an experienced trial judge after a protracted hearing (two weeks, 15 witnesses, and over 1,800 pages of testimony), during which he observed and appraised the credibility of the witnesses, who gave conflicting testimony with respect to the crucial issue of consent. Having observed the witnesses, including the defendants Rothberg and Wilson, and noted the conflict in their testimony, Judge Bartels unequivocally found:

> "It was not at the request of either Wilson or Rothberg that the officers proceeded to the lower level. They therefore had no consent or legal basis to do so."

The record reveals that this finding was made after resolving a conflict in the testimony as to whether the defendants consented to the officers' descent to the basement. In the first place the testimony of four of the detectives who were present in the house at the time when the basement was visited (Holden, Byrne, Ryan and Canavan) was internally contradictory. Holden and Ryan testified that their trip to the basement in the presence of both defendants was occasioned by the request of Rothberg and Wilson, who asked for their jackets because of the cold weather as the officers and their prisoners were about to leave the house. Furthermore, according to this version there was no request for the jackets in order to obtain car keys or identification. Canavan and Byrne, on the other hand, testified that when they earlier asked Wilson for his Ford automobile keys and identification, he first attempted to keep them away from the basement by stating that his jacket was in the master bedroom. When this proved to be untrue, he directed them to his jacket in the basement, which they visited with him, but not with Rothberg.

If the foregoing inconsistent testimony of the policemen stood alone, one might conclude that despite the conflict all police had agreed that the trip to the basement was made only with the consent of Wilson, Rothberg, or both of them. Rothberg and Wilson, however, took the stand and testified in extensive detail, describing their version of the events immediately following the agents'

---

1. Judge Mulligan is of the view that if the defendants had revealed that the keys to the Ford Transit were in the basement, the officers, in the absence of consent, could properly have gone there to seize them. There was no such finding by the trial court. Furthermore, even if there were, I think that under the circumstances of this case there was no excuse for the officers' failure to secure a search warrant.

forceable entry into the house. They denied telling the police that their jackets were in the basement, that they requested the jackets, or that they otherwise consented to the policemen's trip to the cellar. Rothberg testified that he first saw his jacket when the police brought it up from the basement; Wilson testified that since he knew the drugs were in the basement he claimed that another jacket in the upstairs bedroom was his but was then confronted with his wallet which the police had already taken from his jacket in the basement. In addition, the testimony of Rothberg and Wilson that the police systematically ransacked the house was corroborated by that of Rothberg's father, who testified that when he returned home from a vacation a few days after this incident, he noted that the residence had been thoroughly searched, with radiator covers removed, dresser drawers opened, contents removed, furniture broken, and a chest lying open on the floor.

As I read Judge Bartels' thorough opinion, his reference to the "conflicting police testimony" did not, as the majority opinion suggests, represent a rejection of the defendants' testimony. On the contrary he apparently decided, in view of the conflicting police testimony, which shed considerable doubt upon the credibility of the detectives, to credit that of the defendants, concluding that the Government had failed to sustain its burden of proof. If the trial judge had rejected the defendants' testimony on the issue of consent, I believe he would have said so, as he did, for example, on the issue of whether the defendants had received *Miranda* warnings.[2]

In view of the clear findings of the trial judge, I do not think that we should usurp his role by substituting our findings for his, which reflect his estimation of the witnesses' credibility, see Walling v. General Industries Co., 330 U.S. 545, 550, 67 S.Ct. 883, 91 L.Ed. 1088 (1947). His unequivocal conclusion that the officers' visit to the basement "was not at the request of Wilson or Rothberg" and that the officers had "no consent" were not clearly erroneous and should therefore stand. Rule 52(a), F.R.Civ.P. Furthermore, they are supported by the application of common sense. It is unrealistic to assume that Rothberg and Wilson, knowing that narcotics were in plain view in the basement, would direct the police to such highly incriminating evidence. Compare United States v. Titus, 445 F.2d 577 (2d Cir.), cert. denied, 404 U.S. 957, 92 S.Ct. 323, 30 L.Ed.2d 274 (1971).

Nor can I agree with the majority's gratuitous comment that "[t]here is no evidence here of coercion or other circumstances that would render the consent invalid." It is undisputed that at least five of the police broke into the premises and placed Rothberg and Wilson under arrest. In addition, there was testimony from Detective Canavan that at the time of his arrest, Wilson was "petrified," and that before he "consented" to the officers' going downstairs he told them, "I am very nervous. Nothing like this has ever happened to me." Other factors—such as the presence of several police officers with guns drawn, one sticking his gun in Wilson's face from time to time—similarly raise a doubt as to whether the consent which the majority finds here was unequivocal, free, and intelligent. Since Judge Bartels concluded that the defendants had not consented to a search of the basement, he had no occasion to pass upon whether any consent was voluntary, and

---

2. "Both Brittman and Wilson contend that their confessions must be suppressed because they were never informed of their *Miranda* rights and because they were threatened with cruel and unusual punishment if they refused to cooperate with the police, including unfortunate consequences for their respective wives. The court has listened carefully to the stories of both Brittman and Wilson. They were horror stories which seven police officers categorically denied and which the court does not believe."

the issue was neither briefed nor argued by the parties.[3]

Accepting the trial court's finding that the police had no permission or request to go to the basement, their visit to that portion of the residence violated the mandate of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The "plain view" doctrine of Coolidge v. New Hampshire, *supra,* is therefore inapplicable, since it is predicated upon the assumption that the police are lawfully in the area where the contraband was seen, which was not the case here. In view of the large number of police participating in this sizeable operation of the New York Joint Task Force—11 officers in all—and the further fact that the premises had been under surveillance for more than eight hours before the forceable entry, I am confident that it was feasible for the police to have obtained a warrant, either before or after the entry, which would have entitled them to search the entire premises, rather than to have engaged in conduct prohibited by the Fourth Amendment.

3. The Government in this appeal attempted to justify the warrantless search of the Rothberg basement on the sole grounds that it was incident to a lawful arrest and that it was warranted by "exigent circumstances," i. e., the nighttime setting and the nature of the crime (narcotics).